72 So.2d 326 (1954)
OCCHIPINTI et al.
v.
BOSTON INS. CO.
No. 20174.
Court of Appeal of Louisiana, Orleans.
April 26, 1954.
Rehearing Denied May 24, 1954.
Shirley G. Wimberly, Anthony R. Occhipinti, Leo R. Wertheimer, New Orleans, for plaintiffs-appellees.
*327 Bienvenu & Culver, New Orleans, for defendant-appellant.
JANVIER, Judge.
This is one of fifteen appeals, thirteen to this Court and two to the Supreme Court, all from suits filed by the same plaintiffs against different insurance companies, each of which had issued to the plaintiffs a policy of fire and windstorm insurance on a building owned by them in which a fire occurred on August 1, 1951. The face amount of the several policies totaled $70,000. Plaintiffs, claiming that the building was so badly damaged as to constitute a total loss, claim of each company the total face amount of the policy issued by it.
The plaintiffs, in addition to the amount claimed on the fire loss, claim from each company the unearned portion of an additional premium which had been paid for what is termed "Premium Insurance," the meaning of which term we shall later explain.
Plaintiffs also claim penalties and attorneys' fees, basing this claim on the charge that the refusal of each company to pay the full amount of the policy was arbitrary and capricious and without probable cause, and that accordingly defendant became liable for such penalty and fees because of the provisions of LSA-R.S. 22:658.
This defendant, and the defendants in the other suits, conceding that the building sustained very substantial damage, declare that the loss cannot be considered as total and maintain that substantial portions of it, which could have formed part of a repaired building, remain intact, and that therefore the building could be repaired and that plaintiffs are entitled to recover only what would have been the cost of making the repairs.
In the alternative, the defendant here and the defendants in the other suits maintain that, even if the loss should be considered as total, they, under their policy provisions, acting together, had the right to reconstruct the building as it was before the fire, and that in either of two situations,the cost to repair it in the one case, or the cost to reconstruct it in the other case, would have been far less than the amount of the total loss which plaintiffs are claiming.
The fifteen defendant companies in this and the other cases secured from certain contractors bids for the placing of the building back into the condition in which it was before the fire. One of these bids, though not the lowest, was $54,209, and defendants paid to plaintiffs this amount, each paying its pro rata share based on the total amount of all the policies, and agreed that the plaintiffs, by accepting this amount, might still retain the right to sue each of the companies for the total face of its policy. In addition to the total amount paid to plaintiff by all of the fifteen insurers, they also paid $3,383.34, which they say represented the value of the unearned portions of the extra premium which had been charged for what is known as "Premium Insurance."
The policy issued by Boston Insurance Company was in the sum of $3,500, and the premiums which were paid on this policy and which were insured under its premium insurance provisions were $263.20. The pro rata of the defendant, Boston Insurance Company, which was paid by it to plaintiffs, amounted to $2,710.45 on the fire loss and $167.68 on premium insurance, making a total paid by this company of $2,878.13.
Plaintiffs, claiming that, as a matter of fact, the defendant here is additionally liable for $789.55 on the fire loss and $74.63 for returned premium insurance, has brought suit against this defendant for those two amounts, or a total of $864.18, and has also claimed a penalty of twelve per cent for failure to make payment promptly, and five per cent interest on both principal and penalty, and for attorneys' fees of twenty-five per cent on both principal and penalty, and all costs.
From a judgment in favor of plaintiffs as prayed for defendant has appealed suspensively.
*328 The first question to be considered is whether the loss sustained by plaintiffs should be considered as total, because if it was not, then plaintiffs are not entitled to recover the full face amount of each policy and their recovery from each company must be limited to that company's pro rata share of the amount which would be necessary to restore the building to its former condition.
Just what constitutes a total loss is an interesting and much litigated question. Counsel for plaintiffs rely upon three decisions, two by the Supreme Court of Louisiana, and one by this Court, and they say that if the legal conclusions reached in those cases be applied to the facts here, it must be held that, as a matter of law, a total loss was sustained by plaintiffs. These cases are: Monteleone v. Royal Insurance Company, 47 La.Ann. 1563, 18 So. 472, 56 L.R.A. 784; Hart v. North British & Mercantile Ins. Co., 182 La. 551, 162 So. 177, and Mix v. Royal Exchange Assur. Co., La. App., 54 So.2d 355.
In his reasons for judgment, the Judge of the Twenty-fourth Judicial District Court, Division "B", obviously referred to these three decisions when he said:
"The defendants cited several cases of courts of other states, several of which enumerate the principal directly opposite that adopted by the courts of this State in its interpretation of the meaning of the phrase `constructive total loss'. Therefore, the Court must follow the interpretation of our own appellate courts which the Court believes to be the most logical, * * *."
Counsel for defendants insist that they do not contend that the Louisiana decisions cited reach conclusions different from those reached in other jurisdictions, and that, as a matter of fact, when the facts which appear in each of those three cases are carefully analyzed, it will be seen that in each of them the facts justified the conclusion that, in each, there was a total loss.
Counsel point to the fact that in the Monteleone case, supra [47 La.Ann. 1563, 18 So. 475], the Court stated that "A total loss may be claimed though the walls of a building stand, and the elements that composed it be not entirely consumed.'" The Court then said:
"`The insurer, taking a risk on an old, and in this instance an insecure building, incurs the obligation to pay for a total loss if the injuries by the fire, combined with antecedent defects, make repairs impracticable.'"
In the Hart case, supra [182 La. 551, 162 So. 179], the Court found that following:
"The fire in the present case actually consumed and destroyed 75 per cent. of the property insured; the remaining 25 per cent. was so damaged as to become worthless for building purposes; and the city of Shreveport ordered the debris remaining after the fire to be demolished and removed, because it was a nuisance, and the cost of demolition and removal exceeded its value by $12."
The Court then said:
"The property insured was a dwelling house. The fire rendered it useless for the purpose for which it was used; it was totally destroyed, as a building, as all of its value as such to the owner was destroyed, and hence a total loss to her. The right of petitioner, as the owner, to recover insurance for the face of the policy in this case was therefore complete."
In the Mix case, supra, we were dealing with a situation in which the insured building had been completely demolished by a hurricane. The owner of the building which had been insured had gathered together as much of the lumber and other material as could be collected and then, unfortunately, this material and lumber had been consumed by fire. When the insurer refused to pay for the loss under the fire policy, the owner brought suit, and we, holding that the policy had covered a dwelling and not the parts and material which *329 had originally composed it, said [54 So.2d 359]:
"Under the well established jurisprudence, once the building under protection lost its character and identity, the policy contracts afforded plaintiff no protection against destruction of the materials which had once constituted the structure."
Counsel for defendant have directed attention to numerous decisions of many jurisdictions and, after reading them and also the three decisions cited on behalf of plaintiffs, we reach the conclusion that, on the question of what constitutes a total loss within the contemplation of such a policy, our courts and the courts of other jurisdictions do not take divergent views and that, under all of the cases, it is held that it is not necessary that every item of material which formerly was in the building must be destroyed or consumed in order that it be held that a total loss has been sustained. In practically all of the cases there is laid down the rule that a total loss has been sustained wherever the building has been so damaged that in effect it has lost its identity as a building, and that even though certain parts which remain may be made use of, if the work which is required must be looked upon as construction rather than repair, the loss must be considered as total.
It is true that in some of the cases it is stated that there are two rules, one of which is applied in some courts, the other in other courts,the one being what is sometimes referred to as the "Useable Remnant Rule," and the other as the "Loss of Identity Rule."
In Franklin Fire Ins. Co. v. Brewer, 173 Miss. 317, 159 So. 545, 548, 160 So. 387, the Supreme Court of Mississippi discussed this question at length and, referring to these rules as conflicting, said, among other things:
"According to the author of the note to the case of Monteleone v. Royal Ins[urance] Company], etc., 47 La. Ann. 1563, 18 So. 472, 56 L.R.A. 784, two conflicting rules have been adopted, which are as follows: `One rule and it is the earlier oneprovides that a total loss has been sustained whenever the building has been so injured as to lose its identity and specific character as such; and the other declares that it is not totally destroyed so long as a substantial remnant remains which a prudent uninsured person would use in rebuilding; and the reported decisions are founded on one or the other of these rules.'"
While we think that the latter of the two rules,that a total loss has not been sustained if a prudent owner, having no insurance and desiring to obtain a similar building, would have made use of the remnants which remained,comes very close to setting forth a fair rule, we are not completely satisfied that that rule should be applied in all cases. We have in mind a situation such as that which is presented here; where there remains standing and in place sufficient parts of the building and foundations to justify the belief that the owner, if he had no insurance, would probably have used those parts, but that there is nevertheless a fair possibility that defects might later develop. In such case we are not at all sure that it would be fair to say that the owner must take the chance of using such portions of the building and such foundations as remain. Should defects develop a considerable time after construction had been completed, the owner would be in a very disadvantageous situation. Where there exists reasonable possibility for doubt as to the condition of those walls or foundations which remain, we think that the owner should not be forced to submit to the use of those portions of the original building and take the chance that no defects will later manifest themselves.
This rule does not do violence to the rule followed by our Courts in the cases cited to the effect that, in order that it be held a total loss has been sustained, it is not necessary that it appear that every *330 part of the building and all of the materials which composed it be consumed, and that a constructive total loss has occurred either when the building has been so damaged as to lose its identity, or has been so nearly completely destroyed that a reasonably prudent owner would not care to take the chance of using those parts which remain standing.
It is evident that there is a radical difference of opinion among the building experts produced by the plaintiffs and those produced by defendants as to whether any substantial portion of the building which remained might safely be used in an effort to obtain a building similar to that which was insured.
On behalf of plaintiffs there were placed on the stand four experts to testify as to whether the job of putting the plaintiffs into the position in which they were prior to the fire could be considered as a repair or as a reconstruction job. Each of them felt that no substantial portion of the building could be safely or profitably used; that the loss was total and that complete reconstruction would be required.
James J. Cullotta, a general contractor, says that:
"* * * I would say it's a total loss, * * *"
but he did add:
"* * * although there may be materials there that you can salvage."
He said that it would not be proper to repair the building as "it would cost probably more than if he could take it down." He made no itemized estimate of the probable cost of either case.
Patrick M. Allison, who had had five years experience as an architect and twenty-five years experience in construction, said that he had examined the building about two months before the trial of the case and had examined it again on the morning of the trial. He said:
"* * * the central portion of the building, the roof, had been demolished, had been burned and ruined beyond repair. The New Orleans side, possibly one wall can be salvaged, but it was scorched. The only material or the only structure in the whole building that I saw that could be reused, was the tile in the back restroom, the ceramic tile. Even the plaster on the outside, the cement plaster, seemed dead to me."
He also said:
"* * * I would contend that it was a total loss * * *."
And he added:
"I would consider it a rebuilding job."
Concerning the foundations, he said that he could not tell whether they could be used;
"you can't tell very well unless you put it through a testing laboratory."
He added:
"* * * when a fire takes place and it is very hot and heats up around that particular section of the foundation, it could be fractured, and unless they took a test of that foundation in that particular case, there is no possible way that the man could say this is good or this is bad."
He also said:
"I would definitely not use the foundation in the rear part of the Baton Rouge side."
Peter D'Angelo said that he had had seven years experience in estimating construction and repairs and that he was thoroughly familiar with the building before the fire as he had done quite a lot of remodeling work in it. He examined it after the fire and said that he would consider it a rebuilding job. He also said:
"My estimation, it's a complete loss."
He referred particularly to the foundations and the stucco with which the outside of the building was finished and said *331 that he could not tell whether either could be safely used. He said that from the appearance of some of the walls on the outside possibly some of them could be used, but he added:
"but not on the inside though; really get fooled when you get on the inside of it."
W. R. Griffin, a general contractor since 1945, who had been in "building" all his life, said that he had been engaged in estimating and in general supervising since he had been a general contractor. He said: "* * * I would consider it a total loss"; that it would not be feasible or advisable to attempt to repair it. He conceded that some of the studs and walls might "possibly" be used, but "that the cost of labor in attempting to use these studs would overcome the cost of new material." He stated that, in his opinion, the structure had lost its identity as a building and this statement was made by the other experts who were placed on the stand by plaintiffs.
On the other hand, on behalf of defendant and the other insurance companies, building experts testified that substantial portions of the building might be used as they were and that the loss could not be considered as total; that a repair job and not a reconstruction job was indicated.
Most interesting testimony was given by L. P. Smith. He was called to the stand by counsel for defendant who, however, insisted that Smith had been called for examination "under the act," as Smith had prepared plans and specifications for the repair of the building, thinking that he was doing so for the plaintiffs. Smith said that he had been a general contractor for forty years; that though he was not a registered architect, he had practiced as an architect "prior to the time the law went into effect." It seems that, at the request of the Homestead Association which held a mortgage on the property, he had been asked to prepare the plans and specifications to be followed to place the building back into its prior condition and that he, Smith, thought that he was being employed by plaintiffs to prepare these plans and specifications. Smith says that he examined the building carefully and went into all details, and that the plans and specifications were prepared either by him or in his office. Referring to the type of work necessary, he was of the opinion that some parts of the building could be used; that it was not a reconstruction job, but he added:
"* * * if I had to tear the building down or replace it, I would have rather torn it down, but I wouldn't consider it a loss; that is, I mean by that, I believe those people who are more familiar with repairs of fire jobs could have salvaged quite a bit of it."
In spite of the fact that Mr. Smith seemed of the opinion that the loss was not total; that a repair job was involved, and that some parts of the building could be used, he stated, as we have already said, that if he had to do the work he would prefer to rebuild it, and there is in the record a letter which was written by him later in which he had made a bid to do the work and in which he said:
"* * * it is my opinion that the entire replacement of these walls would be less costly than repairs. I also propose to demolish and replace same in the above price."
As to whether or not it would be advisable to use foundations or stucco work which had gone through a fire of this kind, there is a difference of opinion. Smith, referring to the stucco and the walls and to their re-use, not in this particular case, but generally, said
"* * * if I have to use my judgment, I will tear it down because I would be afraid of comeback; later owners complain of damage from fire from stucco or something of that kind, * * *."
One very experienced and responsible contractor, George J. Lupo, offered to put the building back into the condition in *332 which it was before the fire for the amount which was conceded by the companies to be the amount to which they, together, were liable to plaintiffs. Lupo, for thirty-one years, had been a contractor. He had constructed numerous buildings and recently most of his work had been "repair, alterations." He said that he had carefully examined what remained after the fire and he made an estimate. He offered to put the building back into the condition in which it was before the fire for the amount which was paid by this and the other defendants to plaintiffs as the amount which plaintiffs were entitled "to restore the building to its original status."
Another experienced and responsible contractor, J. A. Haase, who for thirty-eight years, had been in the construction business in and near New Orleans, said that he was thoroughly familiar with the details and with everything called for by the plans and specifications; that be considered the work a repair job; that he would have furnished bond. He made a bid slightly lower than that of Lupo.
A very interesting fact is, that it seems quite evident that for sometime after the loss, the plaintiffs appeared entirely willing to consider the repair of the building as distinguished from reconstruction. This is made very clear by the evidence which shows that when the plans and specifications, which were prepared by Mr. Smith or in his office, were shown to them, they did not demand that a new building be constructed, but merely found that two items had been omitted from the plans and specifications. They insisted that these should be added. One of these concerned the type of floor covering and the other concerned the complete reconstruction of the walk-in freezer. These changes were made in the plans and specifications before the bids were obtained. Just before these bids were obtained it appears that, though the plaintiffs did not agree, it was not their intention to demand that the building be completely rebuilt. It was only at a later conference at which there was present the brother of plaintiffs, who was an attorney and who seems to have advised that they had a right to demand an entirely new building in the event that it should be considered that the old building was constructively a total loss, that they then insisted that they were entitled to the entire face amount of each policy because of the total or constructive total loss of their original building.
We also note that there are in the record quite a number of photographs showing the condition of the building after the fire, and it must be conceded that from some of these it would appear that certain exterior portions of the building have been damaged very slightly, if at all. From others it would appear that the interior has been so badly damaged that there might be grave fear that the exterior had sustained damage from the inside which might not be apparent from an examination of the exterior.
All of these facts create the impression that probably for sometime after the fire everyone contemplated that the building probably could have been safely repaired for the amount of the bid submitted by Lupo, and that had it been so repaired, probably it would have been as safe as a new building.
But we cannot overlook the fact that there was and is considerable expert opinion to the effect that there would have been a danger that possibly at some later time there might have developed defects which might not at first manifest themselves, but which nevertheless might be attributed to the damage done by the fire to those portions of the building which some of the builders say they could have made use of.
Should an insured owner be required to assume the hazard of such a possibility? We think not. We feel that an insured owner in such a case is entitled to be made whole and that he is not made whole when there is a reasonably remote possibility that at sometime in the future he may be called upon to repair defects *333 resulting from the occurrence of the hazard against which he has purchased insurance. In such case he has sustained at least constructive total loss and is entitled to recover for such loss.
The alternative defense is that the insurer, together with the defendants in the other cases, even if the loss should be considered as total, had the option to replace the building rather than to pay the total face amount of the policy.
This contention is based on a policy provision to the effect that, even in the event of total loss, it, the insurer, was given the right, if it chose to do so, to rebuild or replace the property, and that in order that it might have an opportunity to intelligently determine whether to exercise that right to reconstruct, it was entitled to receive from the plaintiffs verified plans and specifications of the building which was to be replaced; that the plaintiffs failed to produce such verified plans and specifications, and consequently this defendant, acting with the others, was deprived of the opportunity to determine whether it was advisable to replace the property rather than to pay to plaintiffs the total face of its policy.
The plaintiffs concede that they did not furnish to this and the other companies such plans and specifications, but they maintain that they were under no obligations to do so for the reason that the policy provision, on which this alternative defense depends and on which they and the other companies rely, is of no effect because it is in violation of a statute of Louisiana which overrides and makes null the policy provision granting to the company the option to rebuild even in case of total destruction. It is thus the contention of the plaintiffs that, in spite of the policy provisions relied on, the only right, or more properly, the only obligation of the insurer in the event of total loss, is to pay the full face amount of the policy. If this contention is sound, then in the event of loss, the only question which is presented is the extent of that loss. If it is total, then, because of the provisions of the Louisiana valued policy law, LSA-R.S. 22:695, the insurer may not question the value of the destroyed property.
The policy provision on which the insurer relies as giving it the right to replace the property even in the event of total loss reads as follows:
"It shall be optional with this Company to take all, or any part, of the property at the agreed or appraised value, and also to repair, rebuild or replace the property destroyed or damaged with other of like kind and quality within a reasonable time, on giving notice of its intention so to do within thirty days after the receipt of the proof of loss herein required."
This language is clear and unambiguous, and unless there is some provision in the laws of Louisiana which makes such a provision unenforceable, then the company, with the other insurers, had the right to demand that it and they be provided with the plans and specifications in order that they might intelligently determine whether to reconstruct the building. But plaintiffs say that the stipulation in the policy is overridden by the provisions of section 1 of Act 540 of 1950, LSA-R.S. 22:695.1, which reads in part as follows:
"Be it enacted by the Legislature of Louisiana that in all contracts of fire insurance which may hereafter be entered into and which are intended to take effect on property immovable by nature or destination situated within the State of Louisiana, the insurer shall pay to the insured in case of total loss the total amount for which the property is insured in the policy, or policies."
Section 2 of this statute makes null and void "any policy of insurance subsequent to the promulgation of this Act contrary to this Act".
In the valued policy law of Louisiana and as it appears in Revised Statutes of 1950, LSA-R.S. 22:691 and 22:695, the insurer is given the right to place in its policy the reservation of the option to replace *334 the property even if it is totally destroyed.
Both LSA-R.S. 22:691 and LSA-R.S. 22:695 were adopted by the Legislature prior to the later enactment, LSA-R.S. 22:695.1 in Act 540 of 1950 which, as we have already shown, provides that, in case of total loss, the insurer shall pay "the total amount for which the property is insured". And in this later act there is no provision giving to the insurer the option which appeared originally in the two earlier provisions.
It cannot be denied that, under the clear wording of Act 540 of 1950, the obligation of the insurer is to pay the total amount of the loss, and counsel for plaintiffs insist that, in enacting the statute, the Legislature evidenced the intention of nullifying that part of the earlier enactments which granted to the insurer the option to rebuild.
Counsel for defendants, on the other hand, point out that no where in the later statute, Act 540 of 1950, is there any express reference to the earlier provision, nor is there any express statement concerning the express or implied repeal of the earlier provision granting to the insurer the option to rebuild, and counsel, realizing that if it was not the purpose of the Legislature in enacting Act 540 to deprive the insurer of that option, some reason must be found for the enactment of the later statute, say that this reason was the intention of the Legislature to include within the contemplation of the valued policy law property immovable by destination as well as property immovable by nature, and they point out that in the valued policy law, LSA-R.S. 22:695, as originally enacted, the only property contemplated was property immovable by nature whereas in the later enactment, Act 540 of 1950, LSA-R.S. 22:695.1, there was also included within the contemplation of the valued policy law property immovable by destination. There is no doubt that that was certainly one of the purposes of the Legislature in enacting Act 540 of 1950, for it provided that where immovable property, whether immovable by nature or by destination, is totally destroyed there can be no question as to the value of the property.
It is argued by defendant that that and only that was the intention of the Legislature in adopting the later enactment, and that there was no intention to deprive the insurer of the right given it by the policy to rebuild, even in case of total loss. In support of this argument counsel direct attention to the fact that at the next regular session of the Legislature, in 1952, there was adopted Act 295 which again expressly provided, just as had been provided originally, that the insurer, if the policy so provided, should have the option of replacing totally destroyed property. In that statute, Act 295 of 1952, it was again provided that the valued policy law should be held to contemplate property immovable by destination, as well as property immovable by nature. And it was also expressly provided that nothing in the statute should be construed as preventing the insurer "from replacing property, immovable by nature or destination, partially damaged or totally destroyed."
We also note in passing that LSA-R.S. 22:691 is not referred to either in LSA-R.S. 22:695 or LSA-R.S. 22:695.1. In LSA-R.S. 22:691, in a paragraph headed "Company's Options," it is provided that
"It shall be optional with this Company to take all, or any part, of the property at the agreed or appraised value, and also to repair, rebuild or replace the property destroyed or damaged with other of like kind and quality within a reasonable time, on giving notice of its intention so to do within thirty days after the receipt of the proof of loss herein required."
We think it probable that when the Legislature, after enacting the earlier statute, later adopted Act 540 of 1950 at a subsequent session of the Legislature in the same year, the members thereof had no intention of depriving the insurer of the option which it reserved in its policy and which was expressly reserved to it in LSA-R.S. 22:691 and in LSA-R.S. 22:695.
*335 And if there were found in the later statute, Act 540, any ambiguous wording which could be construed as indicating uncertainty, we would have no hesitation in declaring that that statute, while it was in force, did not deprive any insurer of such option. But we can find in that statute nothing which is ambiguous; nothing which can be pointed to as aiding in ferreting out some other intention on the part of the Legislature than that which is expressly set forth in the statute, that the insurer must pay the full amount of the policy where the loss is total.
We note a very interesting discussion of the right of the insurer to rebuild, and, in connection with this right, to demand the production of plans and specifications in Daul v. Firemen's Insurance Company, 35 La.Ann. 98. There the insurer contended that it had the right to rebuild and had been deprived of this right by the failure of the insured to furnish plans and specifications. The facts very much resemble those found here and are as follows:
"The evidence establishes that the defendant was promptly notified of the loss, and that immediately thereafter, the parties entered into prolonged negotiations for its settlement. Investigations were made by the inspector of the Company. The Company never disputed the loss. It proposed to rebuild, as authorized by the policy. Estimates of the cost of rebuilding were obtained by both parties. They could not agree upon the plans and cost of rebuilding. The whole finally culminated in an offer of the Company to pay $1,500 on the buildings and $450 on the furniture. It was declined, ending negotiations, and followed by the present suit. * * *"
The Supreme Court said:
"That under the policy, defendant had the right to rebuild, which they offered to exercise, but were not allowed to do so by plaintiff. The evidence does not establish such a distinct election to rebuild on the part of defendant or such a default on the part of plaintiff to permit them to do so, as would defeat his action for pecuniary indemnity. There were negotiations on the subject of rebuilding in which the parties did not agree, but the defendant never insisted on its right to rebuild nor made any demand on plaintiff to permit the same. * * *"
Our conclusion is that in 1952 the Legislature realized that, in enacting Act 540 of 1950, it had done something not intended. Realizing that all that was intended was to make the provisions of the valued policy law applicable to all kinds of immovable property, it passed the act of 1952 which repealed the unintended provisions of Act 540 of 1950, and then it reenacted those provisions which covered properties immovable by destination.
We feel that it cannot be said that, in the interim between the passage of Act 540 of 1950 and the passage of Act 295 of 1952, LSA-R.S. 22:695.1, the former was ineffective and did not have the effect which very plainly flowed from its express provisions. As a matter of fact, although, in Act 295 of 1952, Act 540 of 1950 is repealed, it is expressly provided in section 2 that that statute shall remain in force as to all policies which were written before the effective date of the act of 1952.
Having concluded that if the loss sustained should be considered as total, the insurer did not have the option to replace the property but was bound to pay the plaintiffs the full amount of the policy and that therefore the failure of the plaintiffs to furnish to the insurer verified plans and specifications was unimportant and that the loss was total, we must next determine just what is due to plaintiffs by this insurer.
We consider the question presented by the claim for the unearned portion of the premium paid for premium insurance.
When an insurance policy is purchased and a loss occurs, if the loss is only partial, the payment by the insurer reduces the insurance *336 protection by the amount of the payment. In order to avoid this effect, an owner of property who obtains insurance is permitted to pay an additional premium and, by this additional premium, to obtain "premium insurance" as a result of which after a partial loss has occurred, his total coverage remains as it originally was. In other words, the amount by which the coverage would have been reduced by the payment is automatically replaced. It follows, of course, that where the loss is total, there can be no replacement of the "used up" insurance coverage as there is no property on which it could apply. Thus there is due back to the insured the unearned portion of the premium insurance.
To determine what is the unearned portion of the premium insurance a mathematical calculation is necessary. The policy of the defendant was written for a five-year term. This five-year term, including leap year, (as calculated by plaintiffs, we think, correctly) consisted of 1,827 days. This policy was dated March 12, 1951. The fire occurred on August 1, 1951. After the loss there remained 1,682 days of the policy term. The premium on the premium insurance which was paid was $263.20. By using a very simple formula, it will be seen that of the premium paid for premium insurance $242.31 remained unearned. This should be returned to the insured. The defendant company and those in the other suits concede this, but they maintain that, since these policies include coverage against windstorm as well as against fire, and, as this loss resulted from fire, the portion of the premium insurance which should be returned is not the entire unearned portion, but only the pro rata of the unearned premium insurance which was applicable to the fire coverage. We cannot agree with this reasoning.
Since the property was entirely destroyed there remained nothing to which either windstorm coverage or fire coverage might attach. We think that on this item there is due to the insured the entire unearned portion of the premium paid for premium insurance. In addition to this, of course, the amount due on the face of the policy is the difference between the total amount of the policy, $3,500, and the pro rata of the payment of $54,209 that this Company paid. This was $2,710.45, so that on the fact of the policy the amount due is $789.55, the amount claimed from this company and the amount awarded on this item was $789.55.
There remains only the question of whether the defendant should be liable for penalties and attorneys' fees which, under LSA-R.S. 22:658, are due where the refusal to pay is arbitrary, capricious and without probable cause. On behalf of plaintiffs it is argued that the law on what constitutes a total loss is so well settled in this state that the refusal of defendant to pay the full face amount of the policy could have resulted only from caprice. Hart v. North British & Mercantile Ins. Co., supra, is cited as authority for the view that even in a case where there is room for disagreement, an insurer refusing to make full settlement should be required to pay the penalty and the attorneys' fees.
The Hart case was decided before the enactment of the present section of the Revised Statutes. At that time, as a result of the statute which was then in force, Act 195 of 1948, § 14.48, it was mandatory that the penalty and the attorneys' fees be assessed wherever the defendant company failed to pay the full amount ultimately held to be due.
Surely if ever there was a situation in which there was room for doubt on the question of whether a total loss had been sustained, this is such a case. Not only do several experts say that no total loss has occurred, and not only do three of them say that they could restore the building for a sum much below that required for payment for total loss, but the photographs of the exterior of the building indicate the possibility that two of the experts may have been correct in their conclusion that the building, by the use of those parts which remain, could have been put back into the condition in which it was prior to the fire. As a matter of fact, we *337 ourselves, after a careful study of the record, entertain some doubt on the question.
We conclude that a total loss has been sustained because of two facts; first, that the trial court so concluded after hearing all of the witnesses, and second, because we cannot erase the impression that had the repairs been permitted there would have remained the reasonable possibility that undiscovered damage might later manifest itself.
Under these circumstances, we cannot agree that the refusal of the defendant to make full payment was arbitrary or capricious or without probable cause.
Our conclusion is that the judgment is erroneous insofar as it awards additional penalties and attorneys' fees.
The judgment appealed from is amended by the elimination of the amount of the penalty awarded and attorneys' fees; in all other respects the judgment appealed from is affirmed, appellees to pay costs of appeal, all other costs to be paid by appellant.
Amended and affirmed.